We will now proceed to our second case, case number 242838, 3240, and 1450, Cordellione v. Arnold. Mr. Barto, whenever you are ready. No rush. Wait until everyone gets settled in. All right. Very good. Go ahead. Good morning, and may it please the Court. The Eighth Amendment is not a medical code that strips policy makers of their traditional authority to resolve disagreements. What it prohibits is deliberate indifference or the wanton infliction of pain. So a prisoner cannot make out an Eighth Amendment claim where there is a disagreement or uncertainty. In this case, we have the uncertainty and disagreement at two levels. First, there is ongoing debate over WPATH's stance that surgery is the answer for gender dysphoria. Mr. Barto, with regard to that, I know that there is a lot of ink spilled in the briefs and the amicus briefs with regard to the WPATH standards and what weight should be given to them. But we're talking about a preliminary injunction order here. We're talking about a district court that's limited to the record before it. And on that record, the district court made a factual finding that the WPATH standards represent widespread consensus in the medical profession. We review that for clear error, which is obviously a very deferential standard to the district court. Why should we review that under – or should we review that under any other standard, and if so, why? So two responses, Your Honor. So I think the district court's primary error was not a factual finding, but assessing this under the wrong legal standard. The question is not just, do most physicians recommend a particular course of action, is it widely accepted? It's, is there no disagreement? And I don't think the district court made that finding, and this turns to the second part of the answer. If it had, that would have been clear error. And I think there's a couple of categories of evidence that the district court didn't address that show that. So first we – That show what? I'm sorry. That preclude any finding that there's no debate about – Well, but is – I mean, do you – I guess that's the other thing. You know, the question I had was, you talk about in your brief the – you refer to a no minimally competent professional standard. And, you know, kind of tracking that down, at least based upon my research, that seems to start at this case Colligan versus Milwaukee County, where there we equated that standard with the absence of professional judgment. And so here it seems like you're using that standard, no minimally competent professional, to say that as long as there's one competent professional in the world that would disagree with it, then there could be no deliberate indifference. But is that the right standard? Because even in Gibson, the Fifth Circuit said, you know, universal acceptance does not mean – does not require unanimity. Here it seems like you're requiring unanimity. Is that consistent with the substantial departure standard that the Supreme Court has articulated in these types of cases? Well, I think what all of these different formulations are getting at at bottom is that deliberate indifference is a subjective standard that requires something approaching total unconcern for a prisoner's welfare. Right. And I'm just trying to borrow down because on this kind of no minimally competent professional standard that the briefs keep going back to, and, again, the briefs kind of interpret that as saying that there has to be – it seems to me the briefs are suggesting there has to be unanimity. In other words, every competent professional in the world has to agree that the WPATH standards are – should control these types of factual situations. But I wonder where do you find – can you point me to any authority that either in the Supreme Court or factually in our cases that have said that you need such unanimity? Well, I think, Your Honor, what is a fairly common fact pattern in this court's cases is you have two physicians. You may have an expert hired by the plaintiff and then a defendant physician who have different opinions about how a prisoner should be treated. Wilson v. Adams is one example of that, and that usually defeats an Eighth Amendment claim. And I think that's because it is ultimately a subjective standard. And so if the treating physician in those cases exercised professional judgment, it may be bad judgment, it may be out of practice, but it's not an Eighth Amendment violation. And so – and really what they come down to is the physician says, I don't care about this prisoner. When we're talking about the legislature – But, Counsel, we've gone further in our case law, and if I'm understanding Indiana law correctly, a medical professional can't make an independent judgment that gender-affirming surgery is medically necessary. And if I'm right, how do you square that with Roe v. Aaliyah? So I think you're right about what the statute requires, but that's where I think looking to the broader debate is so important. Because when we're evaluating a legislative decision, we have to start with the assumption the legislature acted in good faith. And so the question becomes, is there evidence to show that the legislature acted in good faith as opposed to saying just we don't care about prisoners? And here there is abundant evidence of that. There's the medical literature where you have the federal government in its own assessment of surgery saying the clinical evidence is inconclusive. You have Branstrom saying that the effect of interventions on long-term mental health is largely unknown and that there is a lack of sufficient evidence to provide – or lack of sufficient knowledge to provide evidence-based recommendations. Alsman saying that the mental health effects of gender – Let me ask you this. Let's assume, hypothetically speaking, we're talking – let's not talk about WPATH. Let's talk about, I don't know, other standards, right? Standard Q, let's say. And there is widespread agreement amongst – in the medical community. Not universal agreement, but widespread agreement that standard Q is what is acceptable professional practice. Those are the professional standards. But there are some competent professionals that disagree. In your mind, can a legislature, in the face of that record, say, you know what, we don't – we're going to take the side of the – I guess the minority group of professionals. And we're going to say – we're going to impose a complete ban on those types of procedures. Does the Eighth Amendment allow that? I think it does, Your Honor. And that's precisely – And so if there's – so let's take – I don't know. Let's take cancer of some sort, and there's chemotherapy. And if the – and let's say there's widespread acknowledgment that this type of chemotherapy is effective and necessary to treat this particular type of cancer. But there's some good faith disagreement. There are a handful of experts that agree otherwise. In that case, the legislature can say, you know what, we don't care about all of this other stuff. We think that as a policy matter, we are going to take the side of this other minority group of physicians. And as a complete ban, we're going to foreclose any independent or individual determination, and we're going to say that that type of chemotherapy is not allowed in our prisons. I take it that's your position that the legislature has the authority to do that. Yes, but I think what is important to note, the caveat that comes, that there's a minority perspective that is saying instead of chemotherapy, we recommend something different like radiation. Then there is the obligation to do something. We're not taking the position that the legislature can just say no treatment whatsoever, and we're very far from that here. And I think to speak more directly to your question, Judge Kohler, about Roe, I think the difference there is that the evidence showed, or at least suggested on summary judgment, that there wasn't actually an exercise professional judgment. Instead, the prison adopted a policy to just, as they said, keep it simple. They acknowledged that for some subset of prisoners, the drugs were necessary, but they just decided not to do it. So where would the independent medical judgment be here? So I think the problem with the policy in Roe was that there was no judgment being exercised in the creation of the policy. Where the judgment was being exercised here is at the legislative level, saying there is ongoing disagreement over these surgeries, and we are making a determination that these surgeries should not be provided. The legislature, of course, did not foreclose alternative methods of addressing gender dysphoria, including psychotherapy, including through hormones, including through social support. Instead, what it targeted was what remains the most controversial intervention, which is irreversible surgery. And for you to defend that statute here, and in this context, and as Judge Lee noted in the preliminary injunction context, one of the factors the court's going to be looking at is the likely success on the merits. And you could either show, hey, that was a correct judgment, and there's no Eighth Amendment violation, because this procedure is never medically necessary. Or you could have shown this procedure was not medically necessary for the plaintiff. We're on clear air on some factual findings, and where do you get there on this record on either of those two? So I think the critical one is that the standard is there's no genuine debate. And if we're talking about the legislative determination, even if you just look no further than the medical literature, it's littered with some of the statements I was describing earlier. And even Oltzman said, quote, the mental health effects of gender-affirming surgery thus remain controversial. I think that's clear evidence there is ongoing debate. I think I'm getting back to what Ms. Kohler was saying. I mean, perhaps as this case continues, that those facts can come up in discovery, and there may be expert testimony, and the court will have to balance that. And perhaps in the end of the case, after additional discovery, the court may come to a separate, another conclusion that WPAT standards are not universally held or widely held. But here, based upon the preliminary injunction record at least, the court has made a factual finding that they are, and that we review for clear error. And so I understand that there's all this literature out there otherwise, and I understand from the amicus briefs that there's maybe some dispute about the motivations behind the WPAT standards, et cetera, et cetera, but none of that was before the district court. And we are limited to the record in this case and what district court found in this case. And so I guess based upon that, I come back to my original question, which is how do you show clear error? So, Your Honor, all of the literature I was just describing was admitted at the hearing. You can find it at docket 54- And the court weighed it, and the court weighed it, and it determined that, you know, for example, it determined that Dr. Levine's testimony was not credible and that the other facts, the other testimony and evidence was, which district courts do all the time. And that type of weighing is, you know, the province really of the district court, which is why we have such a deferential standard. Well, I think, Your Honor- And so aren't you just asking us to re-weigh the evidence and give it different weight than what the district court did? No, Your Honor, and I think that's because the standard here is not which expert has the best view of how this particular plaintiff should be treated. The standard is, is there genuine debate? And the district court did not address any of the medical literature showing there is a debate. It just said, you know, I'm more persuaded by the plaintiff's expert. And now turning to the individual plaintiff, I think we have the same problem. We have two physicians who both who are isolated psychiatrists who examine the plaintiff, Dr. Beers and Dr. Frusciola, who said, I don't think this plaintiff has distresses related to gender dysphoria, and we do not recommend surgery. And now, of course, the plaintiff has an opposing expert, but because this comes back to being a subjective standard, I don't see how the district court could find that the department actually knew and disregarded the risk when two specialists to examine the plaintiff said, we don't think that the plaintiff is a candidate for surgery. That seems to be the precise sort of exercise of disagreement, difference of a professional opinion. I guess, but the district court discounted, I mean, again, thought that that second expert was not credible because she did not have the requisite experience in this area, which is, again, something district courts seem to do all the time. If I could just ask, going back to my kind of cancer, my inarticulate cancer discussion, because Lord knows I'm not a medical professional. So let's say that there's an option between radiation and chemotherapy, as you said, in that fact scenario. And let's say that it's undisputed, again, hypothetically, that for this particular person, individual A, that radiation won't work, but chemotherapy will, or that chemotherapy could possibly work, but radiation certainly won't. Given that fact situation and the legislature's, in that fact situation, complete ban on chemotherapy, under that scenario, would those facts create a violation of the Eighth Amendment? I think we would have a harder case under precedents like Roe, but I think there could be factual nuances that actually change the outcome. For example, this court has said, for example, cost can be a relevant consideration in formulating policies. And I think, likewise, it would depend on what is the level of certainty regarding one of the two options. Any other questions? We'll give you some more time on your part. Thank you. Mr. Falk. Good morning, and may it please the Court. This case is Roe. This case is Healds. This is a blanket ban on the provision of medically necessary care to treat a serious condition, gender dysphoria. Mr. Falk, let's say that there was honest disagreement among professionals whether or not your client needed the surgery. Yes. Okay. And it's not even the predominant view, but let's say that there was a competent expert or a series of experts that pointed out some good faith reasons why perhaps surgery is not necessary for your client. And an IDOC, based upon that, says, you know what, surgeries, we're not going to give you the surgery. Yes. Even with that fact scenario, would you still argue that that is a violation of the Eighth Amendment? Well, I mean, obviously, if you have a podiatrist examining her and someone who's experienced with gender dysphoria, that I would say yes. But all things being equal, that no, that's what the Eighth Amendment law tells us. But that's not the case here. Dr. Fargella admitted that he had no experience examining persons for gender dysphoria, and the court, therefore, did not credit his testimony. Dr. Beers, not only did the court question whether she had any experience, but she herself said she had no experience and she was not comfortable doing the examination. The facts in this case, the district court established that doing evaluations is a subspecialty that requires you to not be the podiatrist, in my example. So that is not the case. And what this is really, as the court has noted, this is a clear error case. At no point does the DOC claim that the findings the district court made that gender-affirming surgery is safe, effective, and medically necessary. At no point do they say that's a clear error. And they'd have a hard time doing that because prior to this law, the DOC allowed and approved of prisoners to obtain gender-affirming surgery under a standard that specifically required it to be medically necessary. And, of course, Ms. Corleone was examined by Dr. Randy Etner, who's treated more than 3,000 persons with gender dysphoria and gender other issues, and she concluded that she had severe gender dysphoria, and without the necessary treatment of surgery, would suffer severe harm, perhaps going into suicide. And I'd like to also point out, this is not a WPATH case. Not only was there no evidence to the district court concerning any controversy concerning WPATH because Dr. Levine was mostly doubted, but the district court's findings are that this surgery is medically necessary. Dr. Levine, not a fan of the current WPATH, has approved prisoners for surgery, obviously, assuming that it was medically necessary for them. So the question is, given the record in this case, given that the evidence in the record establishes that this is medically necessary surgery that is absolutely precluded by Indiana law, the only question is that an Eighth Amendment violation, and as the court has noted, that's Roe, that's Fields, refusing to provide effective treatment for a serious mental condition serves no valid penological purpose and amounts to torture. The Eighth Amendment requires, and we talked about, requires individual medical determination, but the law doesn't allow for that. And we would be in a completely different place if this was a situation of an expert A, expert B, and what have you. That's not this. This is a record created through evidence heard before the district court. The district court saw Ms. Coriglione. The district court saw Dr. Edner, albeit on video, the same with Dr. Levine. Ms. Coriglione was in person, and made factual conclusions. We don't hear the state saying they're clearly erroneous. We hear the state saying, well, there's medical journals that say X, Y, and Z. Well, those are all journals that Dr. Levine was relying on, and his testimony was struck under Daubert. This is a clear error case, and there is, though, clear error. What we have here is a complete ban on what is established to be medically necessary surgery, and denying that this court has held, and other courts have held, and the Eighth Amendment holds, violates the Eighth Amendment. Do you agree that Indiana could ban, categorically, some medical procedures? Indiana could ban a medical procedure if there was another medical procedure that was equally efficacious. Indiana could not say, tomorrow, you know, chemotherapy has gotten really expensive, so we're not going to do that anymore. That's rogue. That's fields, right? What this court said in fields was the legislature, I'm quoting, cannot outlaw the only effective treatment of a serious condition like gender dysphoria. Now, that was said in the context, of course, of the medications, of the hormones. But if, in fact, Indiana bans the only effective treatment for condition of your choice, and that's a serious medical condition, that is an Eighth Amendment violation. To what degree must the level of debate rise in your mind for the legislature to be able to say, you know what, there's genuine disagreement amongst experts, and so as a policy decision, we're going to ban this particular procedure? It seems like the legislature does have the ability to do that under certain circumstances, and I'm wondering, under your rule, when would that be? Well, again, I'd have to say that's not this case. I mean, there's no evidence of that debate. There's a lot of noise outside the record in this case, but there's nothing in the record to contradict the judge's conclusions that the PATH standards are credible and persuasive. I understand your position that's not the record in this case, but I'm just, you know, one of our jobs is to try to articulate a rule, right, of that district courts can follow. And I'm just wondering whether, in your mind, how much debate, how much good faith debate is necessary for the legislature to be able to act as a policy matter? I think whatever debate takes place has to take place against the backdrop of, is there another way to treat this serious medical condition? If you look at the Supreme Court's partial birth abortion case, there was a lot of debate about that in the record, about whether it was advantageous or not, or whether it was a good procedure or not. But if you review the case, what the Supreme Court ends up saying is, yeah, the legislature could rely on this, and there are other ways of getting abortions, that you don't need this procedure. So I don't think the Indiana legislature could ever decide that, yes, we acknowledge that X is a serious medical need, but we're going to disallow any way of getting that treatment. So I think that's the answer. Can we turn to the nature of the order that the district court issued? So the order requires IDOC to provide your client with surgery at the earliest opportunity. And I think that language may come from the Ninth Circuit case, or the Cussula case, or the Ninth Circuit case, perhaps Edmo, one of those Ninth Circuit cases. But that was a permanent injunction. It seems like that was after all the merits have been decided. Here, we're at the preliminary stage. And what the state argues is that, look, if the plaintiff has provided the surgery as part of this preliminary injunction order, that's basically tantamount to a permanent injunction. And the district court hasn't made the necessary findings to do that. And so what is your response to that? Well, I mean, this obviously is an affirmative preliminary injunction in the sense that you noted. But the district judge made that decision after weighing the preliminary injunction standards and finding that, given the equitable standards as well as the probability of success on the merits, that is what is warranted, that she should receive, that the DOC should take all reasonable actions to secure surgery at the earliest opportunity. And you see that. But the basic stepping back, kind of 40,000 foot view, the basic nature of a preliminary injunction is, particularly before the merits are decided, is to kind of provide kind of a status quo, right, at least with regard to the final decision. And here, the nature of the order seems to affirmatively give the plaintiff the relief that is being sought in this case. And so I guess I have a hard time seeing how that final relief, that is the surgery itself, is preliminary in any way. Well, again, there are preliminary injunctions outside of this case where courts award what is, in essence, what is the relief requested for final injunction relief. But in those instances, though, the court also considers whether that relief can be undone, right, in the case that the other side ends up winning the merits of the case. Here, I think everyone is agreeing that if your client has provided the surgery, that there's going to be no effort to kind of undo it. I think that is correct, yes, Your Honor. I mean, all I can say, Your Honor, is that that is the calculus that the court reached using the standards for a preliminary injunction. That's what the Southern District of Illinois did in the Glacelius case, granting preliminary injunctive relief. And, of course, in Monroe v. Meeks, a preliminary injunction was entered to supply prisoners with necessary surgery. When a court is faced with a request for a preliminary injunction, the court says, look at the standards. That's what the district court did. And the district court found that this is exactly what was required under Rule 65, given the extreme harm that Ms. Corleone was facing and continues to face today. What is the current status of things with Ms. Corleone? Ms. Corleone has not received surgery, and I believe this has been reported to the district court, so I'm not speaking outside the entire record. At the time of the preliminary injunction, there was one doctor in Indiana performing this surgery. He has since indicated he would not perform surgery for prisoners in the Department of Correction. He's not associated with the DOC or with their contractor. The DOC has contacted and is still contacting other states to determine if Ms. Corleone can be transferred under the interstate compact to get the medical care. Not every state has responded, so the DOC is periodically submitting periodic reports to the court as to that progress. So at this point, at least, there's no particular time frame. At least, that has been said. That is correct. Counsel, a practical question.  I read that Ms. Corleone is scheduled to be released. Is this? Yes. How definite or indefinite is the December 2025 release date? As we noted in our briefing, when this case was decided, her out date was December of 2027. She has picked up enough good time, as it were, so that her earliest possible release date is December 29th. It's a possible release date. That date can change if she loses that time. So we're not in a situation today where things are moot, but it's certainly possible that she will be released December of this year. My understanding is she has no opportunity to advance that date any further, only to lose time. Can I ask a question on the 14th Amendment claim? So after the Court's first ruling, we had a ruling in Case C. I understand the record to be that the Court reversed itself on the 14th Amendment. Yes. Is there anything that your 14th Amendment claim accomplishes? Assuming that we were to affirm on Eighth Amendment grounds, is there any reason to address the 14th Amendment? Well, I think the Supreme Court in the Scrimeti case, which is probably going to be handed down in the next six weeks, is going to tell us. Obviously, if the Supreme Court goes the way of this Court in Case C, finding that there's not a higher level equal protection analysis to be applied, then there's nothing to be gained. If the Court in Scrimeti says that this is entitled to elevated scrutiny, I think that's another ground to get to the same place that we're at now. I understand. That's kind of why I'm asking. Is there any—if we were to affirm on Eighth Amendment grounds, is there any additional relief? Is there any reason that we would have to reach the 14th Amendment? I do not believe so. Thank you. Thank you. I apologize for being evasive. No, I— Did you cross-appeal the district court's 14th Amendment determination?  Okay. Thank you very much. Thank you. Mr. Berta, I'll give you three minutes. Thank you, Your Honor. Let me start by picking up on some of the procedural questions that were asked. So, Judge Lee, you mentioned the problem of the district court's injunction providing effectively what amounts to final relief. And I think that's particularly salient here for two reasons. One is this complaint was framed as alleging the problem was there was no individualized evaluation. And so if that is really the constitutional problem we're talking about, then just saying evaluate the prisoner in the ordinary courts would fully remedy that problem. And it also doesn't create the same sort of potential problem of, you know, mooting an appeal just before it can be heard by this court. And I think the second reason why this is particularly salient is that there is a real question here about whether the prisoner could have succeeded on an Eighth Amendment claim if the statute had never been passed. And I think we see that through the evaluations, not only of Dr. Prusaila, but particularly of Dr. Beers, who prepared a 12-page, single-spaced report saying, I've looked at, you know, interviewed the plaintiff, I've examined the medical record, and I don't think that surgery is the answer for the distress the plaintiff is experiencing. Now, if this were an ordinary Eighth Amendment case, you know, perhaps you would have experts that are debating that, but I think it would be very hard to say there's deliberate indifference based on that careful evaluation, especially when the plaintiff is being provided other treatment to try to eliminate the distress. That includes the plaintiff was seen over 50 times in the last couple of, I think, since 2019. The plaintiff is reporting that I am more okay with my identity now. You have Dr. Prusaila who thought, based on his evaluation, that the plaintiff had largely come to terms with his identity. And I think that would raise the very type of factual question that would, about a difference of a medical opinion, that would preclude a prisoner from succeeding on an Eighth Amendment claim in, you know, in cases where we're talking about an ankle injury or something more mundane. Can you give me any more information with regard to the status of IDOC's efforts to try to schedule the surgery or have her evaluated for surgery? So the Department of Corrections has contacted surgeons throughout Indiana. No surgeon is willing to perform the surgery, which I think is, as an aside, somewhat salient as to whether this is, in fact, necessary. But the department has also contacted other states. Now, to be clear, we don't think that the prisoner can be transferred to another state because there's a specific section of the PLRA that governs transfer orders and requires transfer orders to be made by a three-judge court. But the department, as the district court has noted, has been making reasonable efforts to try to comply with the injunction. Is there any sort of time frame that you could give us with regard to when you think the procedure would be able to be scheduled? I can't say, Your Honor. I will note that there has been testimony in this case that generally, not speaking the case of this particular prisoner, but generally this can be a very long process. I think Dr. Edner said there's usually about a two-year wait list in her office. Another surgeon who previously performed surgeries in Indiana also had about a two-year wait list. So even if you found a surgeon willing to perform it, it could be quite some time before any surgery actually happens. Thank you. The case will be taken under advisement.